AO 91 (Rev. 01/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
District of New Jersey

| | |
|---|---|
| United States of America<br>v.<br>Knut Hammarskjold<br><br>Defendant | Case No. 13-2086 (JS) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of  10/12/2010  in the county of  Burlington  in the _____ District of New Jersey, the defendant violated  18  U. S. C. § 371, an offense described as follows:

See Attachment A

This criminal complaint is based on these facts:

See Attachment B

☑ Continued on the attached sheet.

_____
Complainant's signature

Robert Taylor, Federal Bureau of Investigation
Printed name and title

Sworn to before me and signed in my presence.

Date: 11/08/2013

_____
Judge's signature

City and state:  Camden, New Jersey

Joel Schneider, U.S. Magistrate Judge
Printed name and title

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Honorable Joel Schneider |
| v. | : | Magistrate No. 13-2086 (JS) |
| KNUT HAMMARSKJOLD | : | **CRIMINAL COMPLAINT** |

    I, Robert Taylor, being duly sworn, state the following is true and correct to the best of my knowledge and belief. From at least as early as June 2009 to in or about December 2010, in the District of New Jersey and elsewhere, the defendant KNUT HAMMARSKJOLD did:

SEE ATTACHMENT A

    I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

SEE ATTACHMENT B

continued on the attached page and made a part hereof.

_____<br>
Robert Taylor, Special Agent<br>
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,
on November 8, 2013 at Newark, New Jersey

_____
HONORABLE JOEL SCHNEIDER
UNITED STATES MAGISTRATE JUDGE

CONTENTS APPROVED

UNITED STATES ATTORNEY

By: /s/ Aaron Mendelsohn
Aaron Mendelsohn, AUSA
Date: November 7, 2013

## ATTACHMENT A

### COUNT 1
(Conspiracy to Commit Wire Fraud)

From in or around June 2009 to in or around February 2010, in the District of New Jersey and elsewhere, the defendant, KNUT HAMMARSKJOLD, did knowingly and intentionally combine, conspire, confederate, and agree with others to commit certain offenses against the United States, namely, to unlawfully, willfully, and knowingly devise and intend to devise a scheme and artifice to defraud, and for obtaining money and property and to deprive others of their right to HAMMARSKJOLD's and two other executives' honest and faithful services by means of false and fraudulent pretenses, representations, and promises, to knowingly transmit and cause to be transmitted, by means of wire, radio, and television communication in interstate commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Sections 1343 and 1346.

### Overt Acts

In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the District of New Jersey and elsewhere:

1. On or about August 18, 2009, the owner of a company ("Owner-2") being acquired by HAMMARSKJOLD and others transferred approximately $108,551, as part of an illegal kickback scheme, to a co-conspirator's ("Executive A") Bank of the Philippines bank account in the Philippines.

2. On or about August 18, 2009, Owner-2 transferred an additional approximately $153,324 in kickback funds to Executive A's Bank of the Philippines bank account in the Philippines.

3. On or about November 10, 2009, Executive A sent an e-mail to HAMMARSKJOLD requesting that HAMMARSKJOLD provide wire instructions for HAMMARSKJOLD's portion of the kickback funds.

4. On or about November 11, 2009, HAMMARSKJOLD responded to the e-mail referenced in Paragraph 3 above, instructing Executive A to wire $110,000 to HAMMARSKJOLD's bank account in London and $38,960 to HAMMARSKJOLD's bank account in the Philippines.

In violation of Title 18, United States Code, Section 1349.

## COUNT 2
### (Conspiracy to Violate the Foreign Corrupt Practices Act)

From in or around May 2010 to in or around December 2010, in the District of New Jersey, and elsewhere, the defendant, KNUT HAMMARSKJOLD, did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly conspire, confederate and agree with others to commit offenses against the United States, namely, being a domestic concern, to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist HAMMARSKJOLD and others in obtaining and retaining business for and with, and directing business to, HAMMARSKJOLD's employer and others, in violation of Title 15, United States Code, Section 78dd-2(a).

### Overt Acts

In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the District of New Jersey and elsewhere:

1. On or about October 12, 2010, a co-conspirator of HAMMARSKJOLD ("Executive B"), while in the District of New Jersey, caused a transfer of approximately $133,400 from a bank account in New York to the bank account of a foreign government official (the "Official") in Colombia.

2. On or about December 6, 2010, Executive B, while in the District of New Jersey, caused a second transfer of approximately $66,700 from a bank account in New York to the bank account of the Official in Colombia.

3. On or about December 28, 2010, Executive B, while in the District of New Jersey, caused a third transfer of approximately $66,700 from a bank account in New York to the bank account of the Official in Colombia.

In violation of Title 18, United States Code, Section 371.

## COUNTS 3 THROUGH 5
### (Foreign Corrupt Practices Act)

On or about the dates set forth below, in the District of New Jersey and elsewhere, the defendant, KNUT HAMMARSKJOLD, being a domestic concern, did willfully use and cause to be used the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist HAMMARSKJOLD and others in obtaining and retaining business for and with, and directing business to HAMMARSKJOLD's employer and others, as follows:

| COUNT | DATE | MEANS AND INSTRUMENTALITIES OF INTERSTATE AND INTERNATIONAL COMMERCE |
|---|---|---|
| Three | October 12, 2010 | HAMMARSKJOLD and his co-conspirators, while in the District of New Jersey, caused a wire transfer in the amount of $133,400 from a bank account in New York to the Official's bank account in Colombia. |
| Four | December 6, 2010 | HAMMARSKJOLD and his co-conspirators, while in the District of New Jersey, caused a wire transfer in the amount of $66,700 from a bank account in New York to the Official's bank account in Colombia. |
| Five | December 28, 2010 | HAMMARSKJOLD and his co-conspirators, while in the District of New Jersey, caused a wire transfer in the amount of $66,700 from a bank account in New York to the Official's bank account in Colombia. |

All in violation of Title 15, United States Code, Section 78dd-2, and Title 18, United States Code, Section 2.

## COUNT 6
### (Conspiracy to Commit Money Laundering)

From in or around June 2009 to in or around February 2010, in the District of New Jersey and elsewhere, the defendant, KNUT HAMMARSKJOLD, did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with others to commit offenses under Title 18, United States Code, Sections 1956 and 1957, namely:

   a.  to transport, transmit, and transfer monetary instruments and funds from a place outside the United States to a place in the United States and from a place in the United States to a place outside the United States, with the intent to promote the carrying on of a specified unlawful activity, namely, a felony violation of the wire fraud statute, Title 18, United States Code, Sections 1343 and 1346, and a felony violation of the Foreign Corrupt Practices Act, Title 15, United States Code, Sections 78dd-2 and 78dd-3, in violation of Title 18, United States Code, Section 1956(a)(2)(A); and

   b.  to engage in a monetary transaction by, through, and to a financial institution, in and affecting interstate and international commerce, in criminally derived property that was of a value greater than $10,000.00, that is, the deposit, withdrawal, transfer, and exchange of United States currency, funds and monetary instruments, such property having been derived from specified unlawful activity, namely, a felony violation of the wire fraud statute, Title 18, United States Code, Sections 1343 and 1346, in violation of Title 18, United States Code, Section 1957.

All in violation of Title 18, United States Code, Section 1956(h).

## ATTACHMENT B

I, Robert Taylor, have been a Special Agent of the Federal Bureau of Investigation ("FBI") for approximately sixteen years, and I have been personally involved in the investigation of this matter. The information contained in this Complaint is based upon my personal knowledge, as well as information obtained from other sources, including: (a) statements made or reported by various witnesses with knowledge of relevant facts; (b) my review of publicly available information relating to KNUT HAMMARSKJOLD, the defendant; (c) documents obtained from various sources; and (d) discussions with other law enforcement officials. Because this Complaint is being submitted for the limited purpose of establishing probable cause, it does not include every fact that I have learned during the course of the investigation. Where the content of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## BACKGROUND

At all times relevant to this Complaint:

1. The Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Sections 78dd-1, *et seq.*, was enacted by Congress for the purpose of, among other things, making it unlawful for certain classes of persons and entities to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value to a foreign government official for the purpose of assisting in obtaining or retaining business for, or directing business to, any person.

2. The defendant, KNUT HAMMARSKJOLD ("HAMMARSKJOLD"), was one of two chief executive officers of PetroTiger, Ltd. ("PetroTiger"), a British Virgin Islands oil and gas company with operations in Colombia and offices in New Jersey. During a two-year period, HAMMARSKJOLD and two other executives at PetroTiger ("Executive A" and "Executive B," described more fully below), engaged in a scheme to obtain kickbacks at the expense of their investing partners, in violation of the wire fraud statute, and to pay bribes to a foreign official (the "Official"), in order to secure a lucrative oil services contract in the Republic of Colombia ("Colombia") on behalf of PetroTiger, in violation of the FCPA.

3. HAMMARSKJOLD was a citizen of the United States and thus was a "domestic concern," as that term is used in FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(A). HAMMARSKJOLD's responsibilities at PetroTiger included overseeing the operations of PetroTiger, obtaining contracts with new customers, and retaining contracts with existing customers, including a contract in Colombia with another company, Mansarovar Energy Colombia Ltd., to perform oil-related services in Colombia (the "Mansarovar Contract").

4. Executive A was the other chief executive officer at PetroTiger. Executive A was a citizen of the United States and thus was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(A). Executive A's responsibilities at PetroTiger included overseeing the operations of PetroTiger, obtaining contracts with new customers, and retaining contracts with existing customers, including the Mansarovar Contract in Colombia. In addition, Executive A was responsible for negotiating the terms of the acquisition

of an oil services company with operations in Colombia (the "Target Company," described more fully below).

5. Executive B was an officer and general counsel at PetroTiger. Executive B was a citizen of the United States and a resident of New Jersey and thus was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(A). Executive B worked out of an office in New Jersey. Executive B's responsibilities at PetroTiger included oversight of PetroTiger's bank account in the United States and the authorization of payments from that account.

6. "Employee A" was an employee at PetroTiger involved in engineering.

7. The Target Company was an oil services company with operations in Colombia. Prior to in or around 2009, the Target Company was owned by "Owner-1," "Owner-2," and "Owner-3," described more fully below. In or around 2009, PetroTiger acquired the Target Company for approximately $53 million.

8. Owner-1 was a U.S. citizen and one of three owners of the Target Company.

9. Owner-2 was a U.S. citizen and one of three owners of the Target Company. Owner-2 was the father of Owner-1.

10. Owner-3 was a Panamanian citizen and one of three owners of the Target Company.

11. "Investing Partner 1" was a Colombian national and a member of the board of directors of PetroTiger. Investing Partner 1, together with Investing Partner 1's company, invested approximately $20 million to acquire the Target Company.

12. "Investing Partner 2" was a Colombian national and a member of the board of directors of PetroTiger. Investing Partner 2, together with Investing Partner 2's company, invested approximately $15 million to acquire the Target Company.

13. Ecopetrol S.A. ("Ecopetrol") was the state-owned and state-controlled petroleum company in Colombia and an "agency" and "instrumentality" of a foreign government, as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2). Ecopetrol was created by national law, and it was required by law that Colombia conserve, at a minimum, eighty percent of the shares in circulation, with voting rights. During the relevant time period, Colombia controlled 89.9% of Ecopetrol's outstanding capital stock, and held the right to elect the majority of the members of the company's board of directors. Ecopetrol's board of directors included the Minister of Mines and Energy, the Minister of Finance, and the Director of the National Planning Agency of Colombia. Ecopetrol was responsible for approving contracts to drill or perform services on oil fields in Colombia, including the Mansarovar Contract.

14. The "Official" was an official at Ecopetrol and had influence over the approval and award of contracts by Ecopetrol, including the Mansarovar Contract. The Official was a

"foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2).

15. The "Official's Wife" was the wife of the Official. The Official's Wife purportedly provided finance and management related consulting services for PetroTiger. In reality, the Official's Wife served as a conduit for bribe payments to the Official.

## THE KICKBACK SCHEME

16. From in or around June 2009 to in or around February 2010, HAMMARSKJOLD, Executive A, and Executive B, together with others, engaged in a fraudulent scheme to obtain kickbacks from the owners of the Target Company that HAMMARSKJOLD, Executive A, and Executive B, together with their investing partners, were seeking to acquire.

17. Based upon my and other law enforcement agents' interviews of witnesses and a review of e-mails, I know that Executive A was responsible for negotiating the terms of the acquisition of the Target Company on behalf of the investing partners. In or around June 2009, Owner-1, one of the three owners of the Target Company, requested from Executive A that Owner-1 and the other owners of the Target Company be paid an additional approximately $435,000 in connection with the acquisition of the Target Company. However, Owner-2 and Owner-3 simply wanted to close the deal and were satisfied with the offer price without the additional approximately $435,000. Executive A, on behalf of the investing partners, negotiated the increased purchase price in exchange for Owner-2 and Owner-3 agreeing to kick back their shares of the approximately $435,000 to HAMMARSKJOLD, Executive A, and Executive B.

18. Based upon my and other law enforcement agents' interviews of witnesses and a review of e-mails and bank records, I know that in order to conceal the kickback scheme, HAMMARSKJOLD, Executive A, and Executive B instructed the two owners of the Target Company to pay the kickback into Executive A's bank account in the Philippines, rather than into an account in the United States. Once the money was transferred into Executive A's bank account in the Philippines, Executive A then divided up the money and transferred portions of the money to bank accounts in the control of HAMMARSKJOLD and Executive B. Executive A received approximately $239,015, HAMMARSKJOLD received approximately $106,592, and Executive B received approximately $51,618.

19. Based upon my and other law enforcement agents' interviews of witnesses, I know that HAMMARSKJOLD, Executive A, and Executive B did not disclose to their investing partners that they were receiving a kickback in exchange for the additional money that the investing partners would be paying in connection with the acquisition of the Target Company. As a result, the investing partners were deprived of money and property and the honest services of HAMMARSKJOLD, Executive A, and Executive B.

20. Based upon my and other law enforcement agents' interviews of witnesses and a review of e-mails, I know that HAMMARSKJOLD, together with others, while in the District of New Jersey and elsewhere, discussed via telephone and via electronic mail ("e-mail") methods of concealing and disguising the kickback payments, including using the code name "Manila Split" to refer to the distribution of the kickback proceeds, creating a "side letter" that falsely justified

the kickback payments, and having the proceeds deposited into foreign bank accounts, including HAMMARSKJOLD's bank accounts in the Philippines and the United Kingdom.

21. Based upon my and other law enforcement agents' interviews of witnesses and a review of e-mails, I know that HAMMARSKJOLD, together with others, while in the District of New Jersey and elsewhere, instructed Owner-2 and Owner-3 to deposit the kickback proceeds into Executive A's bank account in the Philippines.

22. Based upon my and other law enforcement agents' review of e-mails, I know that HAMMARSKJOLD, together with others, while in the District of New Jersey and elsewhere, discussed via e-mail how HAMMARSKJOLD, Executive A, and Executive B would divide and share the kickback proceeds.

23. Based upon my and other law enforcement agents' interviews of witnesses and a review of e-mails, I know that HAMMARSKJOLD, together with others, while in the District of New Jersey and elsewhere, discussed in person, via telephone, and via e-mail how Executive A would transfer to HAMMARSKJOLD and Executive B their shares of the kickback payments.

24. On or about August 12, 2009, HAMMARSKJOLD sent an e-mail to Executive B, asking, "…did [Owner-2] send our money out?"

25. Based upon my and other law enforcement agents' review of bank records, I know that on or about August 18, 2009, Owner-2 transferred approximately $108,551 from the bank account of the Target Company to Executive A's Bank of the Philippines bank account in the Philippines.

26. Based upon my and other law enforcement agents' review of bank records, I know that on or about August 18, 2009, Owner-2 transferred an additional approximately $153,324 from the bank account of the Target Company to Executive A's Bank of the Philippines bank account in the Philippines.

27. On or about October 23, 2009, HAMMARSKJOLD sent an e-mail to Executive B with the subject, "[W]hen you have a min could you figure out the Manila split?"

28. On or about November 10, 2009, Executive A sent an e-mail to HAMMARSKJOLD and Executive B with the subject, "Please send me your wire instructions for manila funds."

29. On or about November 11, 2009, HAMMARSKJOLD responded to Executive A's November 10, 2009 e-mail, instructing Executive A to wire approximately $110,000 to his bank account in London and approximately $38,960 to his bank account in the Philippines.

30. On or about January 15, 2010, Executive A caused a wire transfer in the amount of approximately $51,618 from his bank account in the Philippines to a bank account in New Jersey for the benefit of Executive B.

## THE BRIBERY SCHEME

31. Based upon my and other law enforcement agents' interviews of witnesses and a review of e-mails and other PetroTiger documents, I know that from in or around May 2010 to in or around December 2010, HAMMARSKJOLD, Executive A, and Executive B, on behalf of PetroTiger, attempted to secure the Mansarovar Contract. Because Ecopetrol had ultimate authority for approving projects and contracts to perform oil-related services in Colombia, HAMMARSKJOLD, Executive A, and Executive B were required to obtain approval from Ecopetrol for the Mansarovar Contract.

32. Based upon my and other law enforcement agents' interviews of witnesses and a review of e-mails and bank records, I know that in order to secure Ecopetrol's approval for the Mansarovar Contract, HAMMARSKJOLD, Executive A, and Executive B, together with others, paid bribes to the Official, who had the ability to influence the approval process. HAMMARSKJOLD, Executive A, Executive B, and others, attempted to conceal the bribes by funneling the payments through the Official's Wife and by falsely claiming in documents that the payments were for finance and management consulting services that the Official's Wife purportedly performed for PetroTiger. The Official's Wife did not, in fact, perform any such services. When the transfers to the bank account in the name of the Official's Wife failed as a result of incorrect account information, HAMMARSKJOLD, Executive A, and Executive B, together with others, transferred the money directly to a bank account in the name of the Official. HAMMARSKJOLD, Executive A, and Executive B, together with others, made at least four transfers for the benefit of the Official totaling approximately $333,500, between in or around October 2010 and in or around December 2010.

33. Based upon my and other law enforcement agents' interviews of witnesses and a review of e-mails and other PetroTiger documents, I know that HAMMARSKJOLD, Executive A, and Executive B, together with others, were successful in obtaining Ecopetrol's approval, and secured the Mansarovar Contract on behalf of PetroTiger. The Mansarovar Contract was valued at approximately $39.6 million, and has resulted in a gross profit, to date, of approximately $3.5 million.

34. Based upon my and other law enforcement agents' interviews of witnesses and a review of e-mails, I know that HAMMARSKJOLD, together with others, while in the District of New Jersey and elsewhere, discussed in person, via telephone, and via e-mail paying bribes to the Official in order to obtain approval from Ecopetrol for the Mansarovar Contract.

35. Based upon my and other law enforcement agents' interviews of witnesses and a review of e-mails and bank records, I know that HAMMARSKJOLD, together with others, while in the District of New Jersey and elsewhere, offered to pay, promised to pay, and authorized the payment of bribes, directly and indirectly, to and for the benefit of the Official, in order to obtain approval from Ecopetrol for the Mansarovar Contract.

36. Based upon my and other law enforcement agents' interviews of witnesses and a review of e-mails, I know that HAMMARSKJOLD, together with others, while in the District of New Jersey and elsewhere, discussed in person, via telephone, and via e-mail the manner and means by which the bribes were to be paid to the Official.

37. Based upon my and other law enforcement agents' interviews of witnesses and a review of e-mails and bank records, I know that HAMMARSKJOLD, together with others, while in the District of New Jersey and elsewhere, attempted to conceal the bribes to the Official by attempting to pay the bribes to the Official's Wife.

38. Based upon my and other law enforcement agents' interviews of witnesses and a review of e-mails and other documents produced by PetroTiger, I know that HAMMARSKJOLD, together with others, while in the District of New Jersey and elsewhere, further attempted to conceal the bribes to the Official by creating false justifications for the bribes to the Official's Wife, including invoices submitted by the Official's Wife that falsely claimed she performed finance and management consulting services for PetroTiger.

39. Based upon my and other law enforcement agents' interviews of witnesses and a review of e-mails and bank records, I know that HAMMARSKJOLD, together with others, while in the District of New Jersey and elsewhere, caused bribes to be wired from the bank accounts of PetroTiger to the bank account of the Official.

40. On or about October 12, 2010, HAMMARSKJOLD sent an e-mail to Executive B and Employee A and informed Executive B that Employee A "should be sending you the billing details layter [sic] today."

41. On or about October 12, 2010, Employee A responded to HAMMARSKJOLD's e-mail with billing details, including an account number, an ABA number, and a Swift number.

42. Based upon my and other law enforcement agents' review of bank records, I know that on or about October 12, 2010, Executive B, while in the District of New Jersey, caused PetroTiger to transfer approximately $133,400 from its bank account in New York to the bank account of the Official in Colombia.

43. Based upon my and other law enforcement agents' review of bank records, I know that on or about December 6, 2010, Executive B, while in New Jersey, caused PetroTiger to transfer approximately $66,700 from its bank account in New York to the bank account of the Official in Colombia.

44. Based upon my and other law enforcement agents' review of bank records, I know that on or about December 28, 2010, Executive B, while in the District of New Jersey, caused PetroTiger to transfer approximately $66,700 from its bank account in New York to the bank account of the Official in Colombia.