UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA

          v.

KNUT HAMMARSKJOLD

:  Hon. Joseph E. Irenas
:
:  Crim. No. 14-_65 (JEI)
:
:  18 U.S.C. § 371 (Conspiracy);
:  18 U.S.C. § 981(a)(1)(C) and
:  28 U.S.C. § 2461(c) (Criminal Forfeiture)

## INFORMATION

The defendant having waived in open court prosecution by Indictment, the United States Department of Justice, Criminal Division, Fraud Section, and the United States Attorney for the District of New Jersey charge:

At all times relevant to this Information, unless otherwise specified:

### Introduction

1.    The defendant KNUT HAMMARSKJOLD ("HAMMARSKJOLD") was one of two chief executive officers of PetroTiger, Ltd. ("PetroTiger"), an oil and gas services company described more fully below. During the course of a two-year span, HAMMARSKJOLD and two other officers and executives at PetroTiger – Joseph Sigelman and Gregory Weisman (described more fully below) – engaged in a scheme to obtain kick-backs at the expense of their investing partners, and to pay bribes to a foreign official in order to secure approval for a lucrative oil services contract in the Republic of Colombia ("Colombia") on behalf of PetroTiger.

### The Kick-Back Payments

2.    From in or around June 2009 to in or around February 2010, HAMMARSKJOLD, Sigelman, and Weisman, together with others, engaged in a fraudulent scheme to obtain kick-backs from the owners of a company that HAMMARSKJOLD, Sigelman, and Weisman, together with their two investing partners (collectively, the "Investing Partners"), were seeking to

acquire (the "Target Company").

3.      Sigelman was responsible for negotiating the terms of the acquisition of the Target Company on behalf of the Investing Partners, who were funding part of the acquisition. In or around June 2009, one of the three owners of the Target Company requested from Sigelman that the owners be paid an additional approximately $435,000 in connection with the acquisition of their company. However, the other two owners of the Target Company simply wanted to close the deal and were satisfied with the offer price without the additional approximately $435,000. Sigelman, on behalf of the Investing Partners, agreed to the increased purchase price in exchange for two of the owners of the Target Company agreeing to kick back their shares of the approximately $435,000 to HAMMARSKJOLD, Sigelman, and Weisman.

4.      In order to conceal the kick-back money, HAMMARSKJOLD, Sigelman, and Weisman instructed the two owners of Target Company to pay the kick-back money into Sigelman's bank account in the Philippines, rather than into an account in the United States. Once the money was transferred into Sigelman's bank account in the Philippines, Sigelman then divided up the money and transferred portions of the money to bank accounts controlled by HAMMARSKJOLD and Weisman. Sigelman received approximately $239,015, HAMMARSKJOLD received approximately $106,592, and Weisman received approximately $51,618.

5.      HAMMARSKJOLD, Sigelman, and Weisman did not disclose to the Investing Partners that they were receiving kick-back payments in exchange for the additional money that the Investing Partners would be paying in connection with the acquisition of the Target Company and thereby deprived the Investing Partners of money and property and the honest services of HAMMARSKJOLD, Sigelman, and Weisman.

2

acquire (the "Target Company").

3.      Sigelman was responsible for negotiating the terms of the acquisition of the Target Company on behalf of the Investing Partners, who were funding part of the acquisition. In or around June 2009, one of the three owners of the Target Company requested from Sigelman that the owners be paid an additional approximately $435,000 in connection with the acquisition of their company.  However, the other two owners of the Target Company simply wanted to close the deal and were satisfied with the offer price without the additional $435,000. Sigelman, on behalf of the Investing Partners, agreed to the increased purchase price in exchange for two of the owners of the Target Company agreeing to kick back their shares of the $435,000 to HAMMARSKJOLD, Sigelman, and Weisman.

4.      In order to conceal the kick-back money, HAMMARSKJOLD, Sigelman, and Weisman instructed the two owners of Target Company to pay the kick-back money into Sigelman's bank account in the Philippines, rather than into an account in the United States. Once the money was transferred into Sigelman's bank account in the Philippines, Sigelman then divided up the money and transferred portions of the money to bank accounts controlled by HAMMARSKJOLD and Weisman.   Sigelman received approximately $239,015, HAMMARSKJOLD received approximately $106,592, and Weisman received approximately $51,618.

5.      HAMMARSKJOLD, Sigelman, and Weisman did not disclose to the Investing Partners that they were receiving kick-back payments in exchange for the additional money that the Investing Partners would be paying in connection with the acquisition of the Target Company and thereby deprived the Investing Partners of money and property and the honest services of HAMMARSKJOLD, Sigelman, and Weisman.

### The Bribe Payments

6.      The Foreign Corrupt Practices Act of 1977, as amended, Title 15, United States Code, Sections 78dd-1, *et seq.* ("FCPA"), was enacted by Congress for the purpose of, among other things, making it unlawful for certain classes of persons and entities to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value to a foreign government official for the purpose of assisting in obtaining or retaining business for, or directing business to, any person.

7.      From in or around May 2010 to in or around December 2010, HAMMARSKJOLD, Sigelman, and Weisman, on behalf of PetroTiger, attempted to secure an approximately $39.6 million contract with another company, Mansarovar Energy Colombia Ltd., to perform oil related services in Colombia (the "Mansarovar Contract"). Because Colombia's national oil company, Ecopetrol S.A. ("Ecopetrol"), described more fully below, had ultimate authority for approving projects and contracts to perform oil related services in Colombia, HAMMARSKJOLD, Sigelman, and Weisman were required to obtain approval from Ecopetrol for the Mansarovar Contract.

8.      In order to secure Ecopetrol's approval for the Mansarovar Contract, HAMMARSKJOLD, Sigelman, and Weisman, together with others, paid bribes to an official (the "Official") employed by Ecopetrol who had the ability to influence the approval process. HAMMARSKJOLD, Sigelman, Weisman, and others attempted to conceal the bribe payments by funneling the payments through the Official's wife (the "Official's Wife") and falsely claiming in documents that the payments were for consulting services that the Official's Wife purportedly performed for PetroTiger. The Official's Wife did not, in fact, perform any such services. When the transfers to the bank account in the name of the Official's Wife failed as a

3

result of incorrect account information, HAMMARSKJOLD, Sigelman, and Weisman, together with others, transferred the money directly to a bank account in the name of the Official. HAMMARSKJOLD, Sigelman, and Weisman, together with others, made at least four transfers for the benefit of the Official totaling approximately $333,500.

9. HAMMARSKJOLD, Sigelman, Weisman, and others, were successful in obtaining Ecopetrol's approval and secured the Mansarovar Contract on behalf of PetroTiger. The Mansarovar Contract was valued at approximately $39.6 million and has resulted in a gross profit to date of approximately $3.5 million.

### Relevant Entities and Individuals

10. PetroTiger was a British Virgin Islands company with operations in Colombia and offices in New Jersey. PetroTiger was in the business of performing oil and gas related services, including in Colombia.

11. HAMMARSKJOLD was one of two chief executive officers at PetroTiger. HAMMARSKJOLD was a citizen of the United States and thus was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(A). HAMMARSKJOLD's responsibilities at PetroTiger included overseeing the operations of PetroTiger and obtaining contracts with new customers and retaining contracts with existing customers, including the Mansarovar Contract in Colombia.

12. Sigelman was the other chief executive officer at PetroTiger. Sigelman was a citizen of the United States and thus was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(A). Sigelman's responsibilities at PetroTiger included overseeing the operations of PetroTiger and obtaining contracts with new customers and retaining contracts with existing customers, including the Mansarovar Contract in Colombia.

4

In addition, Sigelman was responsible for negotiating the terms of the acquisition of the Target Company, described more fully below.

13.     Weisman was an officer and general counsel of PetroTiger. Weisman was a citizen of the United States and a resident of New Jersey. Thus, Weisman was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(A). Weisman worked out of an office in New Jersey. Weisman's responsibilities at PetroTiger included oversight of PetroTiger's bank account in the United States and the authorization of payments from that account.

14.     "Employee A," an individual whose identity is known to the United States, was an employee at PetroTiger responsible for sales efforts at PetroTiger.

15.     "Employee B," an individual whose identity is known to the United States, was an employee at PetroTiger involved in engineering.

16.     The "Target Company," a company whose identity is known to the United States, was an oil services company with operations in Colombia. Prior to in or around 2009, the Target Company was owned by Owner 1, Owner 2, and Owner 3, described more fully below. In or around 2009, PetroTiger acquired the Target Company for approximately $53 million via funding from several investors (described more fully below).

17.     "Owner 1," an individual whose identity is known to the United States, was a citizen of the United States and one of three owners of the Target Company.

18.     "Owner 2," an individual whose identity is known to the United States, was a citizen of the United States and one of three owners of the Target Company. Owner 2 was the father of Owner 1.

19.     "Owner 3," an individual whose identity is known to the United States, was a citizen of Panama and one of three owners of the Target Company.

20.     "Investing Partner 1," an individual whose identity is known to the United States, was a Colombian national and a member of the board of directors of PetroTiger. Investing Partner 1, together with Investing Partner 1's company, invested $20 million to acquire the Target Company.

21.     "Investing Partner 2," an individual whose identity is known to the United States, was a Colombian national and a member of the board of directors of PetroTiger. Investing Partner 2, together with Investing Partner 2's company, invested $15 million to acquire the Target Company.

22.     Ecopetrol was the state-owned and state-controlled petroleum company in Colombia and an "agency" and "instrumentality" of a foreign government, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2). Ecopetrol was created by national law, and it was required by law that Colombia conserve, at a minimum, eighty percent of the shares in circulation, with voting rights. During the relevant time period, Colombia controlled 89.9% of Ecopetrol's outstanding capital stock, and held the right to elect the majority of the members of the company's Board of Directors. Ecopetrol's Board of Directors included the Minister of Mines and Energy, the Minister of Finance, and the Director of the National Planning Agency of Colombia. Ecopetrol was responsible for approving contracts to drill or perform services on oil fields in Colombia, including the Mansarovar Contract for which PetroTiger was seeking approval.

23.     The Official, an individual whose identity is known to the United States, was an official at Ecopetrol and had influence over the approval and award of contracts by Ecopetrol,

6

including the Mansarovar Contract. The Official was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2).

24.   The Official's Wife, an individual whose identity is known to the United States, was the wife of the Official. The Official's Wife purportedly provided finance and management related consulting services for PetroTiger. In reality, the Official's Wife served as a conduit for bribe payments to the Official.

The Conspiracy

25.   From in or around 2009, and continuing through in or around 2010, in the District of New Jersey and elsewhere, HAMMARSKJOLD did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly conspire with Sigelman, Weisman, Employee A, Employee B, and others known and unknown, to commit offenses against the United States, namely:

   a.   to unlawfully, willfully, and knowingly devise and intend to devise a scheme and artifice to defraud, and for obtaining money and property and depriving Investing Partner 1 and Investing Partner 2 of their right to HAMMARSKJOLD's, Sigelman's, and Weisman's honest and faithful services by means of false and fraudulent pretenses, representations, and promises, to knowingly transmit and cause to be transmitted, by means of wire, radio, and television communication in interstate commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Sections 1343 and 1346; and

b.      being a domestic concern, to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist HAMMARSKJOLD, Sigelman, Weisman, and others in obtaining and retaining business for and with, and directing business to, PetroTiger, and others, in violation of Title 15, United States Code, Section 78dd-2(a).

<u>Purpose of the Conspiracy</u>

26.     The purpose of the conspiracy was for HAMMARSKJOLD, Sigelman, and Weisman to secretly use their positions to enrich themselves by soliciting and accepting kick-back payments from Owner 2 and Owner 3 in connection with the acquisition of the Target Company, and to enrich themselves and PetroTiger by making corrupt payments to an official at Ecopetrol in order to obtain and retain business related to the Mansarovar Contract.

## Manner and Means of the Conspiracy

27.     The manner and means by which HAMMARSKJOLD, Sigelman, Weisman, and their co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following:

### *The Kick-Back Payments*

28.     HAMMARSKJOLD, Sigelman, and Weisman, together with others, while in New Jersey and elsewhere, discussed in person, via telephone, and via electronic mail ("e-mail") obtaining kick-back payments from Owner 2 and Owner 3 in exchange for increasing the purchase price paid by PetroTiger for the Target Company.

29.     HAMMARSKJOLD, Sigelman, and Weisman, together with others, while in New Jersey and elsewhere, discussed in person, via telephone, and via e-mail methods of concealing and disguising the kick-back payments, including using the code name "Manila Split" to refer to the distribution of the kick-back payments, creating a "side letter" that falsely justified the kick-back payments, and having the payments deposited into Sigelman's bank account in the Philippines.

30.     HAMMARSKJOLD, Sigelman, and Weisman, together with others, while in New Jersey and elsewhere, instructed Owner 2 and Owner 3 to deposit the kick-back payments into Sigelman's bank account in the Philippines.

31.     HAMMARSKJOLD, Sigelman, and Weisman, together with others, while in New Jersey and elsewhere, discussed in person, via telephone, and via e-mail the way in which HAMMARSKJOLD, Sigelman, and Weisman would divide and share the kick-back money.

32.     HAMMARSKJOLD, Sigelman, and Weisman, together with others, while in New Jersey and elsewhere, discussed in person, via telephone, and via e-mail the way in which

9

Sigelman would transfer to HAMMARSKJOLD and Weisman their share of the kick-back money.

*The Bribe Payments*

33.     HAMMARSKJOLD, Sigelman, and Weisman, together with others, while in New Jersey and elsewhere, discussed in person, via telephone, and via e-mail the need to obtain approval from Ecopetrol for the Mansarovar Contract.

34.     HAMMARSKJOLD, Sigelman, and Weisman, together with others, while in New Jersey and elsewhere, discussed in person, via telephone, and via e-mail making bribe payments to the Official in order to obtain approval from Ecopetrol for the Mansarovar Contract.

35.     HAMMARSKJOLD, Sigelman, and Weisman, together with others, while in New Jersey and elsewhere, offered to pay, promised to pay, and authorized the payment of bribes, directly and indirectly, to and for the benefit of the Official in order to obtain approval from Ecopetrol for the Mansarovar Contract.

36.     HAMMARSKJOLD, Sigelman, and Weisman, together with others, while in New Jersey and elsewhere, discussed in person, via telephone, and via e-mail the manner and means by which the bribe payments were to be paid.

37.     HAMMARSKJOLD, Sigelman, and Weisman, together with others, while in New Jersey and elsewhere, attempted to conceal the bribe payments to the Official by attempting to make the payments through the Official's Wife.

38.     HAMMARSKJOLD, Sigelman, and Weisman, together with others, while in New Jersey and elsewhere, further attempted to conceal the payments to the Official by creating false justifications for the payments to the Official's Wife, including invoices submitted by the

Official's Wife that falsely claimed she performed finance and management consulting services for PetroTiger.

39.     HAMMARSKJOLD, Sigelman, and Weisman, together with others, while in New Jersey and elsewhere, caused bribe payments to be wired from the bank accounts of PetroTiger to the Official, both directly to the bank account of the Official and indirectly through the bank account of the Official's Wife.

Overt Acts

40.     In furtherance of the conspiracy and to achieve the objects thereof, at least one of the co-conspirators committed or caused to be committed, in the District of New Jersey and elsewhere, at least one of the following overt acts, among others:

*The Kick-Back Payments*

41.     On or about June 8, 2009, Weisman sent an e-mail to Sigelman, stating, "Please confirm that you want [Owner 2] to sign a side letter regarding the $110k payment."

42.     On or about June 8, 2009, Sigelman responded to the e-mail from Weisman referenced in Paragraph 41 above, stating, "YES!"

43.     On or about June 8, 2009, Weisman responded to the e-mail from Sigelman referenced in Paragraph 42 above, stating, "What reason should we put in the side letter for the payment? Also, we'll just say paid at closing as directed by you."

44.     On or about June 8, 2009, Sigelman responded to the e-mail from Weisman referenced in Paragraph 43 above, stating, "Reimbursement for overstated capex?  Advisory fees?"

45.     On or about June 8, 2009, Weisman responded to the e-mail from Sigelman referenced in Paragraph 44 above, stating, "I think we just call it a fee and be very ambiguous."

11

46.     On or about June 8, 2009, Sigelman responded to the e-mail from Weisman referenced in Paragraph 45 above, stating, "Reimbursement means no tax, no?"

47.     On or about June 8, 2009, Weisman responded to the e-mail from Sigelman referenced in Paragraph 46 above, stating, "Yes, but reimbursement of what?  It would have to be a true reimbursement of incurred expenses.  Maybe a reimbursement of personally incurred deal expenses that are in excess of the $7M that we got credit for?"

48.     On or about June 8, 2009, Sigelman responded to the e-mail from Weisman referenced in Paragraph 47 above, stating, "How about – we paid them too much for the capex from the $2mm capex note and it was off by 108$?"

49.     On or about July 14, 2009, Sigelman sent an e-mail to Weisman asking, "What account should we receive it on?"

50.     On or about July 14, 2009, Weisman responded to the e-mail from Sigelman referenced in Paragraph 49 above, stating, "Let's discuss."

51.     On or about July 21, 2009, Sigelman responded to the e-mail from Weisman referenced in Paragraph 50 above, asking, "Is this done?  I sent you my Philippines account, no?"

52.     On or about August 3, 2009, HAMMARSKJOLD sent an e-mail to Weisman instructing Weisman that the "first transfer" should be wired to HAMMARSKJOLD's Citibank bank account in London.

53.     On or about August 3, 2009, HAMMARSKJOLD sent an e-mail to Weisman instructing Weisman that the "second batch" should be wired to HAMMARSKJOLD's Bank of the Philippines bank account in the Philippines.

54.     On or about August 12, 2009, HAMMARSKJOLD sent an e-mail to Weisman asking, "…did [Owner 2] send our money out?"

55.     On or about August 13, 2009, an attorney for the Target Company sent an e-mail to Owner 3, copying Sigelman, stating, "Please keep this email Confidential….Please note that , [sic] pursuant to the agreements reached with you, [Owner 2] and Joe Sigelman regarding SCALA costs , [sic] the following wire payments are to be made, as directed by Joe Sigelman within 10 business days after Closing, which payment date is 8/19/09: 1. From [the Target Company] $153,324.45….2. From [Owner 3's company] $109,372.05….The wire instructions for such payment provided by [PetroTiger] are: BANK OF THE PHILIPPINES ISLANDS…ACCT NAME: JOSEPH SIGELMAN…"

56.     On or about August 18, 2009, Owner 2 transferred roughly $108,551 from the bank account of the Target Company to Sigelman's Bank of the Philippines bank account in the Philippines.

57.     On or about August 18, 2009, Owner 2 transferred an additional roughly $153,324 from the bank account of the Target Company to Sigelman's Bank of the Philippines bank account in the Philippines.

58.     On or about August 25, 2009, Sigelman sent an e-mail to Owner 3, copying Weisman and an attorney for the Target Company, stating, "As an FYI, I have not received the wire."

59.     On or about October 23, 2009, HAMMARSKJOLD sent an e-mail to Weisman with the subject, "[W]hen you have a min could you figure out the Manila split?"

60.     On or about November 10, 2009, Weisman sent an e-mail to Sigelman with the subject, "Manila Split," in which Weisman provided Sigelman with three options for dividing the

kick-back money – total shares that HAMMARSKJOLD, Sigelman, and Weisman held in PetroTiger, the common share ownership by each, and the incentive share ownership by each – which all resulted in Sigelman receiving the largest amount of money, HAMMARSKJOLD the second-largest amount, and Weisman the least.

61.    On or about November 10, 2009, Sigelman responded to the e-mail from Weisman referenced in Paragraph 60 above, stating, "Total share, why not?", which was the option that resulted in Sigelman receiving the most money compared to the other options.

62.    On or about November 10, 2009, Sigelman sent an e-mail to Weisman and HAMMARSKJOLD with the subject, "Please send me your wire instructions for manila funds."

63.    On or about November 11, 2009, HAMMARSKJOLD responded to the e-mail from Sigelman referenced in Paragraph 62 above, instructing Sigelman to wire $110,000 to his bank account in London and $38,960 to his bank account in the Philippines, which was the amount that HAMMARSKJOLD would have been paid under the incentive share ownership option, not the total shares option.

64.    On or about November 11, 2009, Weisman forwarded to Sigelman the e-mail from HAMMARSKJOLD referenced in Paragraph 63 above, and stated, "Based on the numbers in the below email, I take it that we ended up using the split based on the incentive share percentages (45/37.5/17.5).  Is that right?"

65.    On or about November 12, 2009, Sigelman responded to the e-mail from Weisman referenced in Paragraph 64 above, stating, "No.  The one where I got the most.  Knut [HAMMARSKJOLD] just sent me this without thinking."

66.     On or about January 15, 2010, Sigelman caused a wire transfer in the amount of roughly $51,618 from Sigelman's bank account in the Philippines to a bank account in New Jersey for the benefit of Weisman.

*The Bribe Payments*

67.     On or about December 20, 2009, Employee A sent an e-mail to himself regarding conversations he had with Ecopetrol officials about the Mansarovar Contract, stating, "If ECP [Ecopetrol] has to intervine [sic]…they have a comitee [sic] to evaluate it.  [The Official and another official at Ecopetrol] are part of the comitee [sic], but, they can not Approval theirselves [sic].  They have to include their leader…and other people….ECP people is [sic] ready to help, but, they need to know [where we are in the process].  I will wait instructions."

68.     On or about December 20, 2009, Employee A forwarded to HAMMARSKJOLD the e-mail referenced in Paragraph 67 above, stating, "Here we have the latest conversation with ECP Guys.  Well today, another ECP crew is helping us a lot (LED), trying to get this issue closed and to avoid any rebid."

69.     On or about May 29, 2010, Sigelman sent an e-mail to Weisman and Employee A, instructing Employee A to "[p]lease send to Greg [Weisman] the wire instructions for that vendor today," and instructing Weisman to "[p]lease wire immediately."

70.     On or about May 31, 2010, Employee A responded to the e-mail from Sigelman referenced in Paragraph 69 above, stating, "I received the info in Colombia for the vendor. Name [the Official's Wife]."

71.     On or about September 14, 2010, around the time that the Official and others at Ecopetrol approved the Mansarovar Contract, Sigelman caused approximately $66,700 to be wired from PetroTiger's bank account in Colombia to the Official's bank account in Colombia.

72.     On or about September 28, 2010, at a board meeting of PetroTiger, Sigelman stated that he and others were dealing with non-transparent commercial practices in Colombia.

73.     On or about September 28, 2010, at the board meeting referenced in Paragraph 72 above, in response to a question about whether Sigelman was upholding PetroTiger's Code of Business Principles, which included a prohibition on bribery, Sigelman stated that he was.

74.     On or about October 7, 2010, HAMMARSKJOLD sent an e-mail to Weisman attaching an invoice from the Official's Wife for purported "financial and management services rendered through July 31, 2010," and stated, "This is what need [sic] to go out Friday. I would characterize it as a loan/advance to [PetroTiger's Bogota office] so we can bring it down accounting wise / or reverse it."

75.     On or about October 8, 2010, Weisman, while in New Jersey, caused PetroTiger to transfer approximately $133,400 from its bank account in New York to the bank account of the Official's Wife, a transfer that was rejected because the name and the account did not match.

76.     On or about October 12, 2010, HAMMARSKJOLD sent an e-mail to Weisman and Employee B and informed Weisman that Employee B "should be sending you the billing details layter [sic] today."

77.     On or about October 12, 2010, Employee B responded to HAMMARSKJOLD's e-mail referenced in Paragraph 76 above with billing details, including an account number, an ABA number, and a Swift number.

78.     On or about October 12, 2010, Weisman responded to the e-mail referenced in Paragraph 77 above, stating, "Those are the billing details that I used with the account under the name of [the Official's Wife]. Citi said the name did not match the account. Please confirm asap."

79.     On or about October 12, 2010, Employee B responded to Weisman's e-mail referenced in Paragraph 78 above and stated, "Hola Greg. Should be [the Official]."

80.     On or about October 12, 2010, Weisman, while in New Jersey, caused PetroTiger to transfer approximately $133,400 from its bank account in New York to the bank account of the Official in Colombia.

81.     On or about November 17, 2010, the Official's Wife submitted another invoice to PetroTiger, to the attention of Sigelman, essentially identical to the invoice referenced in Paragraph 74 above, except that it was for "financial and management services rendered through August 31, 2010," instead of July.

82.     On or about November 19, 2010, an employee at PetroTiger sent an e-mail to Weisman with the subject, "Invoice [the Official's Wife]," and stated, "Please program for payment. I believe you already know this vendor. As per Joe's [Sigelman] request, please pay half of it this month and the other half on December."

83.     On or about November 30, 2010, Weisman, while in New Jersey, caused PetroTiger to transfer approximately $66,700 from its bank account in New York to the bank account of the Official, a transfer that was rejected because the name and the account did not match.

84.     On or about December 2, 2010, Weisman, while in New Jersey, caused PetroTiger to transfer approximately $66,700 from its bank account in New York to the bank account of the Official's Wife, a transfer that was rejected because the name and the account did not match.

85.     On or about December 4, 2010, Sigelman forwarded to Weisman an e-mail that was sent to Sigelman from the Official's Wife's e-mail account, attaching an invoice dated

December 1, 2010, to the attention of Sigelman, in the amount of approximately $133,400, providing a different ABA number and Swift number than those provided in the invoice referenced in Paragraph 81 above.

86. On or about December 6, 2010, Weisman, while in New Jersey, caused PetroTiger to transfer approximately $66,700 from its bank account in New York to the bank account of the Official in Colombia.

87. On or about December 22, 2010, Sigelman forwarded to Weisman an e-mail that was sent to Sigelman from the Official's Wife's e-mail account that stated, "T[h]anks for the deposite de [sic] two week ago. Please to make the transation [sic] in this week other 50%. The next week I'll give you the first report about XCRM and I'll present you the business plan."

88. On or about December 23, 2010, Weisman, while in New Jersey, caused PetroTiger to transfer approximately $66,700 from its bank account in New York to the bank account of the Official's Wife, a transfer that was rejected because the account was closed.

89. On or about December 28, 2010, Sigelman forwarded to Weisman an e-mail that was sent to Sigelman from the Official's Wife's e-mail account that stated, "Excuse me but is necesary [sic] close this invoice before the new year. Please authorize to pay the other 50%."

90. On or about December 28, 2010, Weisman responded to the e-mail from Sigelman referenced in Paragraph 89 above and stated, "Done last week. Pls confirm receipt."

91. On or about December 28, 2010, Sigelman forwarded to the Official's Wife's e-mail account the e-mail from Weisman referenced in Paragraph 90 above, to which a response was received stating, "Don't appear in account 9937871340, please confirm the account."

92.     On or about December 28, 2010, Weisman, while in New Jersey, caused PetroTiger to transfer approximately $66,700 from its bank account in New York to the bank account of the Official in Colombia.

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATION

93.     Paragraphs 1 through 24 and 26 through 92 of this Information are realleged and incorporated by reference as if fully set forth herein for the purpose of noticing forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(c) and Title 28, United States Code, Section 2461(c).

94.     The United States hereby gives notice to the defendant charged in this Information that, upon his conviction, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(c) and Title 28, United States Code, Section 2461(c), which require any person convicted of any such offense to forfeit any property constituting or derived from proceeds obtained directly or indirectly as a result of such offenses, namely, $106,592.

95.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

> (a)  cannot be located upon the exercise of due diligence;
>
> (b)  has been transferred or sold to, or deposited with, a third party;
>
> (c)  has been placed beyond the jurisdiction of the court;
>
> (d)  has been substantially diminished in value; or
>
> (e)  has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

PAUL J. FISHMAN
UNITED STATES ATTORNEY
DISTRICT OF NEW JERSEY

WILLIAM J. STELLMACH
PRINCIPAL DEPUTY CHIEF
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

21

CASE NUMBER: 14-____ (JEI)

# United States District Court
# District of New Jersey

## UNITED STATES OF AMERICA

**v.**

## KNUT HAMMARSKJOLD

# INFORMATION FOR

18 U.S.C. § 371

**PAUL J. FISHMAN**
*UNITED STATES ATTORNEY, NEWARK, NEW JERSEY*

| | |
|---|---|
| AARON MENDELSOHN | DANIEL S. KAHN |
| *ASSISTANT U.S. ATTORNEY* | *TRIAL ATTORNEY* |
| *NEWARK, NEW JERSEY* | *WASHINGTON, D.C.* |
| *(973) 645-2712* | *(202) 616-3434* |